VICTOR M. SHER (SBN 96197)
vic@sheredling.com
MATTHEW K. EDLING (SBN 250940)
matt@sheredling.com
STEPHANIE D. BIEHL (SBN 306777)
stephanie@sheredling.com
TIMOTHY R. SLOANE (SBN 292864)
tim@sheredling.com
**SHER EDLING LLP**
100 Montgomery St., Ste. 1410
San Francisco, CA 94104
Tel.: (628) 231-2500
Fax:  (628) 231-2929

*Attorneys for Plaintiff Sacramento Suburban Water District*

**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| SACRAMENTO SUBURBAN WATER DISTRICT,<br><br>Plaintiff,<br><br>v.<br><br>THE 3M COMPANY (F/K/A MINNESOTA MINING AND MANUFACTURING CO.), E. I. DU PONT DE NEMOURS AND COMPANY, THE CHEMOURS COMPANY, and DOES 1 through 10,<br><br>Defendants. | Case No.<br><br>**COMPLAINT**<br><br>(1) STRICT PRODUCTS LIABILITY (DESIGN DEFECT);<br><br>(2) STRICT PRODUCTS LIABILITY (FAILURE TO WARN);<br><br>(3) NEGLIGENCE;<br><br>(4) PUBLIC NUISANCE;<br><br>(5) TRESPASS;<br><br><br>**JURY TRIAL DEMANDED** |

# TABLE OF CONTENTS

I.     INTRODUCTION .................................................................................... 1

II.    PARTIES ................................................................................................. 3

       A.  Plaintiff ........................................................................................... 3

       B.  Defendants ....................................................................................... 3

III.   JURISDICTION AND VENUE .............................................................. 5

IV.    FACTUAL ALLEGATIONS .................................................................. 6

       A.  Sacramento Suburban Water District ............................................. 6

       B.  PFAS: Their Chemical Characteristics, Risks, and Regulatory Standards ............... 7

       C.  Defendants' Production of PFAS Products ...................................... 11

       D.  Defendants' Knowledge of Threats Posed by PFAS Products .............................. 12

       E.  Major Sources of PFAS in Sacramento ......................................... 17

       F.  Sacramento Suburban Water District Is Injured ............................ 18

V.     CAUSES OF ACTION ........................................................................... 19

       FIRST CAUSE OF ACTION
            Strict Products Liability for Defective Design ........................................ 19

       SECOND CAUSE OF ACTION
            Strict Products Liability for Failure to Warn ......................................... 21

       THIRD CAUSE OF ACTION
            Negligence ................................................................................... 23

       FOURTH CAUSE OF ACTION
            Public Nuisance ............................................................................ 24

       FIFTH CAUSE OF ACTION
            Trespass....................................................................................... 25

VI.    PRAYER FOR RELIEF .......................................................................... 26

VII.   DEMAND FOR JURY TRIAL ............................................................... 28

# I.    INTRODUCTION

1.    Plaintiff Sacramento Suburban Water District ("Sacramento Suburban," "the District," or "Plaintiff") is a public drinking water purveyor to businesses and residents in communities in Sacramento County, California. Sacramento Suburban brings this action to recover the substantial costs necessary to protect the public and restore its damaged drinking water supply wells from exposure to and contamination with toxic per- and poly-fluroalkyl substances ("PFAS"), including, but not limited to, perfluorooctanoic acid ("PFOA") and/or perfluorooctane sulfonic acid ("PFOS"), from products made, marketed, or used by Defendants.

2.    Plaintiff brings this action to recover costs associated with the contamination of drinking water, surface water and groundwater with PFAS, and further seek abatement of the ongoing nuisance these chemicals constitute in the environment, and for such other action as is necessary to ensure that the PFAS that contaminate the aquifer supplying source drinking water for the District do not present a risk to the public. In this Complaint, references to specific PFAS (*e.g.* PFOS and PFOA) are intended to include those compounds themselves (including all of their salts and ionic states as well as the acid forms of the molecules) and their chemical precursors.

3.    PFAS are a class of chemicals colloquially known as "forever" chemicals because of their persistence and resistance to degradation. PFAS have impacted surface water and groundwater in the vicinity of Plaintiff's wells, and now contaminate the water pumped from certain of Plaintiff's water supply wells.

4.    PFAS are associated with a variety of illnesses, including cancer, and considered particularly dangerous to pregnant women and young children.

5.    Because of the risks that PFAS pose to human health, California's State Water Resources Control Board ("State Water Board") has preliminarily issued notification and response levels for PFAS in drinking water as a prelude to issuing a Maximum Contaminant Level. In general, public water suppliers must report exceedances of notification levels to the State Water Board, and the State Water Board recommends removing a drinking water source from service if it exceeds a response level. The State Water Board has established notification levels for PFOS

and PFOA at 6.5 parts per trillion ("ppt") and 5.1 ppt respectively, and response levels for PFOS and PFOA at 40 ppt and 10 ppt respectively.

6.     The California State Water Board and other state agencies are preparing further regulatory actions on PFAS. Similarly, the U.S. Environmental Protection Agency ("EPA") is preparing further regulatory actions on PFAS under a range of federal laws.

7.     Defendants 3M Company ("3M"); E.I. DuPont de Nemours and Company ("DuPont");  and The Chemours Company ("Chemours"); (collectively, "Defendants"), are major chemical companies that designed, manufactured, marketed, promoted, sold, supplied, distributed, used, and/or disposed of PFAS, products containing PFAS, and/or products that degrade into PFAS after release to the environment (collectively, "PFAS Products"), that currently impact certain of the District's wells.

8.     Defendants knew or should have known that PFAS are highly soluble in water; extremely mobile; persistent; very likely to contaminate surface and groundwater, including drinking supplies; and present significant risks to human health and welfare if released to the environment. Nonetheless, Defendants manufactured, marketed, distributed, sold, and/or promoted PFAS Products that either contained or would degrade to PFAS that currently impact the District's wells.

9.     The Defendants not only failed to warn of these risks and harms relating to PFAS, but also concealed the dangers of PFAS Products from consumers, the public, and the State. Defendants' own research showed that the normal use and disposal of PFAS Products would contaminate the environment and endanger public health. But Defendants denied, downplayed, and distorted these risks.

10.     By marketing, promoting, selling, supplying, distributing, using, and/or disposing PFAS Products in California and in the vicinity of the District's wells, the Defendants caused contamination that threatens the District's water supply.

11.     Plaintiff files this lawsuit to seek abatement of an ongoing nuisance, to recover compensatory and all other damages and relief, including all necessary funds to compensate Plaintiff for the costs of investigating and remediating the contamination of groundwater impacted

by PFAS, designing, constructing, installing, operating, and maintaining the treatment facilities and equipment required to remove PFAS from public water supplies, and for such other damages and relief the Court may order.

## II.    PARTIES

### A.    Plaintiff

12.    Plaintiff Sacramento Suburban Water District is a public drinking water purveyor organized under California Water Code section 30000, et seq. Plaintiff owns and operates drinking water wells and real estate on which its wells are located, in Sacramento County, California. Sacramento Suburban's headquarters are located at 3701 Marconi Avenue, #100, Sacramento, California 95821.

### B.    Defendants

13.    **Defendant 3M Company** ("3M") is a Delaware corporation with its principal place of business in St. Paul, Minnesota. 3M has manufactured, marketed, promoted, distributed, and/or sold PFAS Products throughout the United States, including in California. For instance, 3M has operated and continues to operate four manufacturing plants in California, at least three of which have manufactured PFAS Products: 3M's Monrovia Oral Care Facility manufactures dental products, including some that have contained PFAS; 3M's Corona Plant manufactures, inter alia, roofing granules that have contained PFAS; and 3M's Tape Facility currently manufactures tape and other adhesives that have at times contained PFAS, and over the years of its operations may have also coated fabrics with PFAS chemicals and manufactured other fluorochemical products. 3M has marketed and sold its PFAS Products, including those manufactured at its California plants, in California, with the specific intent to avail itself of the California market; and end users have used and disposed of such products in California in a manner in which led to releases of 3M's PFAS to the environment that have impacted the District's wells.

14.    **Defendant E.I Du Pont De Nemours and Company** ("DuPont") is an American conglomerated chemical company, incorporated in the state of Delaware and with its principal place of business in Wilmington, Delaware. As a large chemicals manufacturer, DuPont

manufactured, marketed, promoted, distributed, and/or sold PFAS Products throughout the United States, including in California and in the vicinity of the District's wells.[1]

15.    DuPont has done business throughout the United States, including conducting business in California, and is registered to do business in California. DuPont has employed workers in California, conducted research relating to its PFAS Products in California (including working with university researchers and academics), and contracted with distributors for the purpose of distributing PFAS Products to California.

16.    **Defendant The Chemours Company** ("Chemours") is a corporation duly organized under the laws of the state of Delaware, with its principal place of business located at 1007 Market Street, Wilmington, Delaware 19899. Chemours was a wholly owned subsidiary of DuPont. In July 2015, DuPont completed its spin-off of Chemours as a separate, publicly traded entity. In connection with the spin-off, Chemours took control of DuPont's performance chemicals business line, including its fluoroproducts business (including PFAS Products). In this transaction, Chemours assumed all or part of DuPont's liabilities relating to PFAS Products.

17.    Chemours does business throughout the United States, including conducting business in California, and is registered to do business in California.

18.    Defendants DuPont and Chemours are collectively referred to herein as the "DuPont Defendants".

19.    At all relevant times, the true names or capacities, whether individual, corporate, otherwise, of DOE Defendants 1 through 100, inclusive, remain unknown to Plaintiff and, therefore Plaintiff sues said Defendants by such fictitious names. Plaintiff is informed and believes, and based thereon alleges that, each of the Defendants designated herein by fictitious names is in some manner legally responsible for the events and happenings herein referred to and caused the damages proximately and foreseeably to Plaintiff as alleged herein.

20.    At all relevant times, all of said Defendants herein, including the named Defendants, and DOE Defendants 1 through 100, inclusive, are collectively referred herein as

---

[1] The District reserves the right to join Corteva, Inc. ("Corteva"), a Delaware corporation with its principal place of business in Wilmington, Delaware, to this complaint. Corteva is the direct parent of DuPont, and it may hold certain relevant assets and liabilities. Corteva conducts business throughout the United States, including in California.

"Defendants," and all acts and omissions of said Defendants were undertaken by each of the Defendants and said Defendants' agents, servants, employees, and/or owners, acting in the course and scope of its respective agencies, services, employments, and/or ownerships.

**III.    JURISDICTION AND VENUE**

21.    The United States District Court for the Eastern District of California has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the matter in controversy is between citizens of different states and exceeds the sum of $75,000.

22.    This Court has personal jurisdiction over Defendants because each Defendant has sufficient minimum contacts in California or otherwise intentionally avails itself of the California market through the distribution and/or sale of PFAS Products in the State of California so as to render the exercise of jurisdiction over it by this Court consistent with traditional notions of fair play and substantial justice.

23.    Each Defendant is a corporation or other business authorized to do business in California and registered with the California Secretary of State. At all relevant times, each Defendant engaged in and was authorized to do business in the state of California.

24.    At all relevant times, the Defendants have engaged in substantial, continuous economic activity in California, including the business of researching, designing, formulating, handling, disposing, manufacturing, labeling, using, testing, distributing, promoting, marketing, selling, and/or otherwise being responsible for PFAS Products, and that said activity by the Defendants is substantially connected to the Plaintiff's claims as alleged herein.

25.    The Defendants purposefully affiliated themselves with the forum of the state of California giving rise to the underlying controversy. Such purposeful availment and activities within and related to the state of California include, but are not limited to, 1) the Defendants' contractual relationships with entities giving rise to researching, designing, formulating, handling, disposing, manufacturing, labeling, using, testing, distributing, promoting, marketing, selling, and/or otherwise being responsible for PFAS Products, which was substantially connected to the Plaintiff's claims as alleged herein; 2) agreements between the Defendants and entities, institutions, and academics within state of California regarding PFAS and PFAS Products where

the Defendants contractually consented to have state courts within the state of California adjudicate disputes; 3) marketing and advertising of certain PFAS Products by the Defendants targeted specifically to Plaintiff within the state of California; 4) lobbying, consulting, and advisory efforts on behalf of the Defendants with regard to PFAS Products stemming from law firms and other agents in the state of California; and 5) other actions by Defendants targeted to the state of California to be obtained through discovery and other means. As the location from which the Defendants' suit-related conduct arose, California has a substantial vested interest in the acts of the Defendants which led to the underlying controversy.

26.    At all times herein mentioned, the Defendants, and each of them, had actual knowledge that each of the other Defendants was going to intentionally and negligently engage in the tortious misconduct and acts alleged in the causes of action set forth in this complaint, including but not limited to the acts, failures to act, misrepresentations and breaches of duties of care owed by each of the Defendants.

27.    Venue is proper in the Eastern District of California pursuant to 28 U.S.C. sections 1391(b) and 1402, because the acts and omissions giving rise to this claim occurred in the Eastern District of California.

## IV.    FACTUAL ALLEGATIONS

### A.    Sacramento Suburban Water District

28.    The District meets its customers' demand for water from municipal supply wells that draw from the local groundwater aquifer. The District gets a substantial portion of its drinking water supply from its wells.

29.    The District holds a property interest in its non-overlying groundwater right that is recognized under the law of the state of California. The District's water right is usufructuary, entitling the District to appropriate and use groundwater from the aquifer underlying its service area to supply its customers with drinking water.

30.    The District owns its drinking water wells and pumping and transmission infrastructure.

31.     The District pumps its groundwater out of the North American Sub-basin ("NAS"), a 548-square mile groundwater basin located in California's Sutter, Placer, and Sacramento Counties. The NAS is bounded by the American River to the South, the Bear River to the North, the crystalline basement rock of the Sierra Nevada to the East, and the Feather and Sacramento Rivers to the West. Sacramento Suburban's service area is located within the surface boundaries of the NAS; all of Sacramento Suburban's wells are located within Sacramento Suburban's service area.

32.     PFAS in the aquifer comes from Defendants' PFAS Products that were used and disposed of or otherwise released in the area overlying the NAS groundwater aquifer.

33.     Sacramento Suburban's wells have produced, produce, and will continue to produce drinking water that is contaminated with PFAS, including, but not limited to, PFOA, PFOS, PFBS, PFHpA, PFHxS, and PFHxA.

**B.     PFAS: Their Chemical Characteristics, Risks, and Regulatory Standards**

34.     PFAS are a family of chemical compounds containing fluorine and carbon atoms.

35.     For purposes of this Complaint, PFAS includes, but is not limited to, the following list of substances (including the chemicals themselves, as well as all of their salts, ionic states, acid forms of molecules, and "precursor" chemicals):

   a.  Perfluorooctanoic acid (PFOA) (Fluorinated Carbon Chain Length: C8) (Chemical Abstract Services Registry Number (CASRN): 335-67-1);

   b.  Perfluorooctanesulfonic acid (PFOS) (Fluorinated Carbon Chain Length: C8) (CASRN: 1763-23-1);

   c.  Perfluorononanoic acid (PFNA) (Fluorinated Carbon Chain Length: C9) (CASRN: 375-95-1);

   d.  Perfluorohexanoic acid (PFHxA) (Fluorinated Carbon Chain Length: C6) (CASRN: 307-24-4);

   e.  Perfluorohexanesulfonic acid (PFHxS) (Fluorinated Carbon Chain Length: C6) (CASRN: 355-46-4);

f.  Perfluorobutanesulfonic acid (PFBS) (Fluorinated Carbon Chain Length: C4) (CASRN: 375-73-5);

g.  Hexafluoropropylene oxide dimer acid (HFPO-DA or GenX) (Fluorinated Carbon Chain Length: C6) (CASRN: 13252-13-6a);

h.  Perfluorotetradecanoic acid (PFTeA) (Fluorinated Carbon Chain Length: C14) (CASRN: 376-06-7);

i.  Perfluorotridecanoic acid (PFTriA) (Fluorinated Carbon Chain Length: C13) (CASRN: 72629-94-8);

j.  Perfluorododecanoic acid (PFDoA) (Fluorinated Carbon Chain Length: C12) (CASRN: 307-55-1);

k.  Perfluoroundecanoic acid (PFUnA) (Fluorinated Carbon Chain Length: C11) (CASRN: 2058-94-8);

l.  Perfluorodecanoic acid (PFDA) (Fluorinated Carbon Chain Length: C10) (CASRN: 335-76-2);

m.  Perfluoroheptanoic acid (PFHpA) (Fluorinated Carbon Chain Length: C7) (CASRN: 375-85-9);

n.  Perfluoropentanoic acid (PFPeA) (Fluorinated Carbon Chain Length: C5) (CASRN: 2706-90-3);

o.  Perfluorobutanoic acid (PFBA) (Fluorinated Carbon Chain Length: C4) (CASRN: 375-22-4);

p.  Perfluorodecanesulfonic acid (PFDS) (Fluorinated Carbon Chain Length: C10) (CASRN: 335-77-3);

q.  Perfluorononanesulfonic acid (PFNS) (Fluorinated Carbon Chain Length: C9) (CASRN: 68259-12-1);

r.  Perfluoroheptanesulfonic acid (PFHpS) (Fluorinated Carbon Chain Length: C7) (CASRN: 375-92-8);

s.  Perfluoropentanesulfonic acid (PFPeS) (Fluorinated Carbon Chain Length: C5) (CASRN: 2706-91-4);

t.  Perfluorooctanesulfonamide (PFOSA) (Fluorinated Carbon Chain Length: C8) (CASRN: 754-91-6);

u.  Fluorotelomer sulphonic acid 8:2 (FtS 8:2) (Fluorinated Carbon Chain Length: C8) (CASRN: 39108-34-4);

v.  Fluorotelomer sulphonic acid 6:2 (FtS 6:2) (Fluorinated Carbon Chain Length: C6) (CASRN: 27619-97-2);

w.  Fluorotelomer sulphonic acid 4:2 (FtS 4:2) (Fluorinated Carbon Chain Length: C4) (CASRN: 757124-72-4);

x.  2-(N-Ethylperfluorooctanesulfonamido) acetic acid (N-EtFOSAA) (Fluorinated Carbon Chain Length: C8) (CASRN: 2991-50-6);

y.  N-Ethyl Perfluorooctane sulfamide (N-EtFOSA) (CASRN: 4151-50-2);

z.  N-Ethyl Perfluorooctane sulfonamidoethanol (N-EtFOSE) (CASRN: 1691-99-2);

aa. Perfluorooctandecanoic acid (PFODA) (CASRN: 16517-11-6);

bb. 4,8-Dioxa-3H-perfluorononanoic acid (DONA) (CASRN: 958445-44-8);

cc. 2-(N-Methylperfluorooctanesulfonamido) acetic acid (N-MeFOSAA) (Fluorinated Carbon Chain Length: C8) (CASRN: 2355-31-9);

dd. 11-chloroeicosafluoro-3-oxaundecane-1-sulfonic acid (11Cl-PF3OUdS) (Fluorinated Carbon Chain Length: C10) (CASRN: 763051-92-9b);

ee. 9-chlorohexadecafluoro-3-oxanone-1-sulfonic acid (9Cl-PF3ONS) (Fluorinated Carbon Chain Length: C8) (CASRN: 756426-58-1c);

ff. 4,8-dioxa-3H-perfluorononanoic acid (ADONA) (Fluorinated Carbon Chain Length: C7) (CASRN: 919005-14-4d).

36.    There are more than 3,000 different types of PFAS. The list contained in the above paragraph is not a complete list of PFAS that are the subject of this Complaint. The Complaint encompasses all of the thousands of PFAS, known or unknown. The District reserves its right to identify additional PFAS through discovery and as the science and research on PFAS develops.

37.    PFAS have been used for decades to produce household and commercial products that are heat resistant, stain resistant, long lasting, and water and oil repellant. PFAS have been

incorporated into products such as dental floss, furniture and carpet coatings, food wrappers, household and commercial pesticides, nonstick pans, clothing, and others. The PFAS family of chemicals is entirely manmade and does not occur in nature. PFOA and PFOS are among the most toxic chemicals in the PFAS family.

38.     PFAS have characteristics that cause extensive and persistent environmental contamination. Specifically, they are (1) mobile—that is, because they are soluble and do not adsorb (stick) to soil particles, and they are readily transported through the soil and into groundwater where they can migrate long distances; and (2) persistent—that is, they do not readily biodegrade or chemically degrade in the environment or in conventional treatment systems for drinking water. In short, once PFAS are applied, discharged, disposed of, or otherwise released onto land or into water, those compounds migrate through the environment and into groundwater, resist natural degradation, and are difficult and costly to remove.

39.     PFAS bioaccumulate and biomagnify in people and other organisms.

40.     Scientists link PFAS with a wide range of serious public health impacts, including kidney and testicular cancer, thyroid disease, ulcerative colitis, high cholesterol, pregnancy induced hypertension, and low birth weight.

41.     PFAS contamination of drinking water presents a serious threat to public health.

42.     In addition to drinking contaminated water, humans can be exposed to PFAS through inhalation, ingestion of contaminated food, and dermal contact.

43.     PFAS enter the environment from industrial facilities that use PFAS in the manufacture or production of other products. Releases to land, air, and water from industrial sites are known pathways to the environment.

44.     PFAS may also enter the environment when released from PFAS-containing consumer and commercial products during their use, and after they have been disposed to landfills or in any other manner.

45.     The Defendants have known of health and environmental risks associated with PFAS compounds for decades but concealed that knowledge until it was exposed through litigation and regulatory action in relatively recent years.

46.    The Defendants' manufacture, distribution and/or sale of PFAS  and/or products containing PFAS resulted in the release of PFAS into the environment.

47.    Through their involvement and/or participation in the creation of consumer or other commercial products and materials and related training and instructional materials and activities, the Defendants knew, foresaw, and/or should have known and/or foreseen that their PFAS Products would contaminate the environment.

48.    The Defendants knew, foresaw, and/or should have known and/or foreseen that their marketing, promotion, development, manufacture, distribution, release, training of users of, production of instructional materials about, sale and/or use of PFAS Products, including in California, would result in the contamination of the groundwater that is the primary source of water supply for Plaintiff's public water system.

49.    The Defendants' products were unreasonably and inherently dangerous and the Defendants failed to warn of this danger.

### C.    Defendants' Production of PFAS Products

50.    PFAS were first developed in the late 1930s to 1940s and put into large-scale manufacture and use by the early 1950s.

51.    For most of the past several decades, 3M has been the primary manufacturer of PFAS in the United States. Beginning in the 1940s, 3M produced PFAS by electrochemical fluorination. This process results in a product that contains or breaks down into compounds containing PFOS, PFOA, PFNA, and/or PFHxS. 3M went on to market several PFOA and PFOS products, including its Scotchgard brand of stain repellant, food packaging, textile treatments, and fluorosurfactants and additives, among many others.

52.    From the 1940s through the early 2000s, 3M was the primary manufacturer of PFAS in the United States. 3M was the only known domestic manufacturer of PFOS and PFHxS. 3M was also a major manufacturer of PFOA.

53.    3M manufactured PFAS as raw chemical materials for use in 3M products and products made by third parties. 3M marketed and sold PFAS Products, throughout the United States and California, including in the Sacramento area.

54.     In response to pressure from the EPA, 3M began phasing out production of PFAS Products in the early 2000s.

55.     In or around 1951, DuPont began to produce and sell polytetrafluoroethylene ("PTFE"). The production of PTFE requires PFOA as a processing aid, and results in the presence of PFOA in some PTFE products. DuPont marketed its PTFE under the trade name "Teflon." PTFE is a fluoropolymer (i.e., a plastic containing fluorine) used in a diverse range of applications, including as sprayable coating that resists heat, water, and oil; a lubricant; a coating for catheters and other medical equipment; and an oxidizer in flares—among many other uses.

56.     DuPont produced numerous other PFAS Products, and it marketed and sold PFAS Products throughout the United States, including in California and in the Sacramento area.

57.     DuPont also began producing PFOA for its own use and for sale in the early 2000s, after 3M ceased PFOA production. DuPont continued to manufacture, market, and sell PFOA until at least 2013.

58.     3M and DuPont were the only companies to manufacture PFOA in the United States.

59.     The Defendants designed, manufactured, marketed, sold, and/or distributed large quantities of PFAS-containing and/or other PFAS Products in California, including in the Sacramento area.

60.     All Defendants designed, developed, manufactured, marketed, sold, distributed, supplied, transported, handled, used, released, and/or disposed of PFAS Products in California in such a way as to cause harm to the State's natural resources, property, and citizens.

**D.     Defendants' Knowledge of Threats Posed by PFAS Products**

61.     For more than 50 years, Defendants were or should have been aware of the dangers posed to people by exposure to their PFAS Products (including via drinking water); and that the production and use of PFAS Products resulted in the release of PFAS to the environment. Despite this knowledge, Defendants failed to adequately investigate and test their products to ensure they would not cause harm to the public; and continued their PFAS production and marketing practices without eliminating the defects in their products, and without warning of the known dangers of

their products. These measures could have eliminated or reduced damage and injuries to Plaintiff's drinking water production wells.

62.    By 1956, PFAS from 3M's products were found to bind to proteins in human blood, resulting in bioaccumulation of those compounds in the human body.

63.    3M was informed as early as 1960 that chemical wastes from its PFAS manufacturing facilities that were dumped into landfills could leach into groundwater and otherwise enter the environment. An internal memo from 1960 described 3M's understanding that such wastes "[would] eventually reach the water table and pollute domestic wells."

64.    By at least the 1960s, 3M was aware that some PFAS do not naturally degrade in the environment. One 1963 report by 3M described PFAS as being stable in the environment, "completely resistant to biological attack," and "toxic."

65.    DuPont company scientists issued internal warnings about the toxicity associated with their PFOA products as early as 1961, including that PFOA caused adverse liver reactions in rats and dogs. DuPont's Toxicology Section Chief opined that such products should be "handled with extreme care," and that contact with the skin should be "strictly avoided."

66.    As early as 1963, 3M was aware that its PFAS Products were stable in the environment and would not degrade after disposal.

67.    By the 1970s, 3M had become concerned about exposure to fluorochemicals in the general population.

68.    By at least 1970, 3M was aware that its PFAS Products were hazardous to marine life. One study of 3M fluorochemicals around this time had to be abandoned to avoid severe local pollution of nearby surface waters.

69.    In 1975, 3M found there was a "universal presence" of PFOA in blood serum samples taken from across the United States. Since PFOA is not naturally occurring, this finding reasonably should have alerted 3M to the likelihood that their products were a source of this PFOA—a possibility that 3M considered internally but did not share outside the company. This finding also should have alerted 3M to the likelihood that PFOA is mobile, persistent,

bioaccumulative, and biomagnifying, as those characteristics would explain the absorption of PFOA in blood from 3M's products.

70.    As early as 1976, 3M began monitoring the blood of its employees for PFAS because the company was concerned about PFAS's health effects.

71.    Other studies by 3M in 1978 showed that PFOA and PFOS are toxic to monkeys. In one study in 1978, all monkeys died within the first few days of being given food contaminated with PFOS. DuPont was aware of 3M's findings no later than 1981.

72.    Also in 1978, based on information it received from 3M about elevated and persistent fluoride levels in workers exposed to PFAS, DuPont initiated a plan to review and monitor the health conditions of potentially exposed workers in order to assess whether any negative health effects could be attributed to PFOA exposure. This monitoring plan involved obtaining blood samples from the workers and analyzing them for the presence of fluorine.

73.    In the late 1970s, 3M studied the fate and transport characteristics of PFOS in the environment, including in surface water and biota. A 1979 report drew a direct line between effluent from 3M's Decatur, Alabama plant and fluorochemicals bioaccumulating in fish tissue taken from the Tennessee River.

74.    According to a 3M environmental specialist who resigned his position due to the company's inaction over PFOS's environmental impacts, 3M had resisted calls from its own scientists going back to 1979 to perform an ecological risk assessment on PFOS and similar chemicals. At the time of the specialist's resignation in 1999, that resistance had not ceased.

75.    In 1981, DuPont was informed that ingestion of PFOA caused birth defects in rats but continued manufacturing the chemical and failed to disclose the study results.

76.    In 1983, 3M scientists opined that concerns about PFAS "give rise to legitimate questions about the persistence, accumulation potential, and ecotoxicity of fluorochemicals in the environment."

77.    DuPont was long aware it was releasing PFAS from its facilities that were leaching into groundwater used for public drinking water. After obtaining data on these releases and the consequent contamination near DuPont facilities in West Virginia and Ohio, DuPont in 1984 held

a meeting at its corporate headquarters in Wilmington, Delaware, to discuss health and environmental issues related to PFOA (the "1984 Meeting"). DuPont employees who attended the 1984 Meeting discussed available technologies that were capable of controlling and reducing PFOA releases from its manufacturing facilities, as well as potential replacement materials capable of eliminating additional PFOA releases from its operations. DuPont chose not to use either, despite knowing of PFOA's toxicity.

78.    During the 1984 Meeting, DuPont employees in attendance spoke of the PFOA issue as "one of corporate image, and corporate liability." They discussed DuPont's "incremental liability from this point on if we do nothing as we are already liable for the past 32 years of operation." They also stated that "legal and medical will likely take the position of total elimination" of PFOA use, and had "no incentive to take any other position."

79.    In 1984, 3M's internal analyses demonstrated that that fluorochemicals were likely bioaccumulating in 3M fluorochemical employees.

80.    By at least 1993, Defendants were aware that PFAS was linked to increased cancer rates in humans exposed to their PFOA products. 3M memos show that in 1993, it worked to change the wording in studies by a Dr. Gilliland, who around that time published a paper demonstrating a 3.3-fold increase in mortality rates for workers employed in jobs that exposed them to PFOA.

81.    Despite its understanding of the hazards associated with its PFAS Products, 3M actively sought to suppress scientific research on the hazards associated with those products, and mounted a campaign to control the scientific dialogue on the exposure, analysis, fate, effects, human health, and ecological risks of its PFAS Products. At least one scientist funded by 3M saw his goal as "keep[ing] 'bad' papers [regarding PFAS] out of the literature" because "in litigation situations" those articles "can be a large obstacle to refute."

82.    3M's own ecotoxicologists continued raising concerns about PFAS until at least 1999.

83.    Despite decades of research, 3M first shared its concerns with the EPA in the late 1990s. In a May 1998 report submitted to EPA, "3M chose to report simply that PFOS had been

found in the blood of animals, which is true but omits the most significant information" according to a former 3M employee.

84.     Indeed, 3M's own employees were highly critical of 3M's management of PFAS risks. In March 1999, for example, 3M environmental scientist Rich Purdy wrote to 3M and expressed his "profound disappointment" with "3M's handling of the environmental risks associated with the manufacture and use of" PFOS. Mr. Purdy described PFOS as "the most insidious pollutant since PCB," and that it is "probably more damaging than PCB because it does not degrade, whereas PCB does; it is more toxic to wildlife; and its sink in the environment appears to be biota and not soil and sediment, as is the case with PCB." Mr. Purdy described his attempts to discuss the dangers of the chemical with the company, and 3M's refusal to act. Finally, Mr. Purdy stated: "I can no longer participate in the process that 3M has established for the management of [PFAS.] For me it is unethical to be concerned with markets, legal defensibility and image over environmental safety."

85.     In response to pressure from the EPA, 3M began to phase out production of PFOS and PFOA products in 2000. On May 16, 2000, 3M issued a news release falsely asserting that "our products are safe," citing the company's "principles of responsible environmental management" as the reason to cease production. On the same day as 3M's phase out announcement, an EPA internal email stated: "3M data supplied to EPA indicated that these chemicals are very persistent in the environment, have a strong tendency to accumulate in human and animal tissues and could potentially pose a risk to human health and the environment over the long term." The author further stated that PFOS "appears to combine Persistence, Bioaccumulation, and Toxicity property to an extraordinary degree."

86.     Even after 3M ceased manufacturing PFAS, it worked to control and distort the science on PFAS and its dangers to the environment and human health. For example, 3M provided millions of dollars in grants to a professor, John Giesy, who publicly presented himself as independent but behind the scenes worked for 3M. Mr. Giesy's goal, as expressed in a 2008 email, was to "keep 'bad' papers [regarding PFAS] out of the literature [because] otherwise in litigation situations they can be a large obstacle to refute." In fact, as recently as November 2018, 3M

publicly stated that "the vast body of scientific evidence does not show that PFOS or PFOA cause adverse health effects in humans at current exposure levels, or even at the historically higher levels found in blood." And in 2019, 3M publicly claimed: "We do not believe that PFOS and PFOA cause harm to human health at levels that are typically found in the environment" and that "[w]e do not believe there is a public health issue related to PFOA and PFOS." These statements contradict decades of research demonstrating the serious health and environmental effects of PFAS, including internal studies conducted by 3M's own scientists.

87.    Similarly, DuPont has downplayed and distorted the science on PFAS. DuPont's own Epidemiology Review Board (ERB) repeatedly raised concerns about DuPont's practice of stating publicly that there were no adverse health effects associated with human exposure to PFOA. In June 2005, DuPont reported to the press that "no human health effects are known to be caused by PFOA." An ERB member called that statement "[s]omewhere between misleading and disingenuous." In February 2006, the ERB "strongly advise[d] against any public statements asserting that PFOA does not pose any risk to health" and questioned "the evidential basis of DuPont's public expression asserting, with what appears to be great confidence, that PFOA does not pose a risk to health."

88.    Contrary to ERB's advice, DuPont's chief medical officer issued a press release in October 2006, stating that "there are no health effects known to be caused by PFOA." An ERB member criticized the press release because it "appear[ed] written to leave the impression 'don't worry.'"

**E.    Major Sources of PFAS Near Plaintiff's Wells**

89.    Manufacturing facilities where Defendants' PFAS Products are synthesized and made into products or chemical feedstocks, or where PFAS are used as processing aids, as well as secondary manufacturing facilities where PFAS Products such as PTFE are applied to other products, are major PFAS release sites. Industries that are known sources of PFAS releases to the environment include textile and leather processing, paper mills, metal finishers, wire manufacturers, plating facilities, manufacturers and facilities using fluorosurfactants, resins, molds, plastics, photolithography, and semiconductors. Commercial facilities such as automotive

shops, print shops, and painting and coating facilities are also potential PFAS release sites. PFAS releases at industrial and commercial sites are generally due to direct wastewater discharge, as well as accidental releases such as leaks or spills.

90.    There are several current and former industrial or commercial sites near Plaintiff's wells or located in the vicinity of sources of Plaintiff's water supply that are likely to have contributed to the release of PFAS from Defendants' PFAS Products, and consequent contamination of Plaintiff's wells. Studies have shown that effluent from onsite wastewater treatment systems, drainage canals, stormwater conveyances, and septic systems are known sources of PFAS contamination to groundwater. Such infrastructure located in the vicinity of Plaintiff's wells are likely to have contributed to the release of PFAS from Defendants' PFAS Products, and consequent contamination of Plaintiff's wells.

91.    Landfills receive industrial waste, sewage sludge, waste from site mitigation, and PFAS-bearing consumer goods. PFAS in landfills and former landfills can leach from these wastes into ground and surface water. PFAS may also be released from landfills in fugitive dust or directly to the atmosphere. Landfills constructed before 1990 that received industrial and construction waste deposits have a higher potential for contributing to PFAS releases because they were not required to be constructed with flexible membrane liners or other leachate control measures. Nationwide studies in the United States, as well as Canada and Europe, have shown high levels of PFAS in landfill leachate.

92.    Municipal and industrial wastewater treatment plants are also repositories for industrial and consumer items containing PFAS. These facilities provide multiple pathways for PFAS from industrial and consumer items to contaminate groundwater, surface water, or both, including by point source discharges of effluent; leakage or unintended releases from sewerage; surface impoundments; air emissions; or disposal of biosolids or other byproducts generated during the treatment process.

## F.    Sacramento Suburban Water District Is Injured

93.    PFAS have been detected in varying amounts at varying times in Plaintiff's wells, including at levels that have compelled Plaintiff to take responsive actions. In addition, PFAS's

high mobility and persistence in soil and groundwater means they will likely continue to spread and affect even more of Plaintiff's wells in the future.

94.     Defendants' PFAS Products are the major sources of the PFAS released to the environment that ultimately reached groundwater that supplies Plaintiff's production wells. PFAS have reached those wells due to the routine, foreseeable, and intended use and disposal of Defendants' PFAS Products in the vicinity of locations from which Plaintiff obtains water, including its groundwater wells. Such use, disposal, and environmental transport has brought PFAS to Plaintiff's wells from releases at a myriad of diffuse sources such as industrial and manufacturing facilities and businesses; locations where PFAS-contaminated water is used for irrigation; sites where consumer products are disposed; and others.

95.     To address PFAS contamination in its wells, Plaintiff has, inter alia, incurred expenses in investigating, monitoring, and developing plans to address PFAS in its wells, including by removing wells from service and planning to add wellhead treatment. Plaintiff anticipates taking these and additional steps to address the continuing and future PFAS contamination in its wells attributable to Defendants' tortious conduct.

96.     The most viable technologies to remove PFAS compounds from drinking water are granular activated carbon treatment ("GAC"), reverse osmosis, electrochemical oxidation, and anion exchange. Each of these technologies is extremely expensive to build, install, operate, and maintain.

## V.     CAUSES OF ACTION

**FIRST CAUSE OF ACTION**
**Strict Products Liability for Defective Design**
**(Against All Defendants)**

97.     Plaintiff realleges each of the preceding paragraphs and incorporates each such paragraph as if fully stated herein.

98.     As commercial designers, manufacturers, distributors, suppliers, sellers, and/or marketers of PFAS Products, Defendants had a strict duty not to place into the stream of commerce a product that is unreasonably dangerous.

99.    Defendants knew that third parties would purchase their PFAS Products and use them without inspection for defects.

100.    PFAS Products purchased or otherwise acquired (directly or indirectly) from Defendants by third parties were applied, discharged, disposed of, or otherwise released onto lands and/or water in the vicinity of Plaintiff's drinking water production wells. Such discharges occurred at various locations, at various times, and in various amounts.

101.    Defendants' PFAS Products purchased by third parties were used in a reasonably foreseeable manner and without substantial change in the condition of such products.

102.    Defendants knew or reasonably should have known that the use of their PFAS Products in their intended manner would result in the spillage, discharge, disposal, or release of PFAS onto land or into water.

103.    The PFAS Products used and/or disposed of in the vicinity of Plaintiff's drinking water production wells were defective in design and unreasonably dangerous because, among other things:

    a.    PFAS causes extensive and persistent groundwater contamination when they, or products containing or degrading to them, are used in their foreseeable and intended manner.

    b.    PFAS contamination in drinking water poses significant threats to public health and welfare.

    c.    Defendants failed to conduct and/or failed to disclose reasonable, appropriate, or adequate scientific studies to evaluate the environmental fate and transport and potential human health effects of PFAS.

104.    At all times relevant to this action, Defendants' PFAS Products were dangerous to an extent beyond that which would be contemplated by the ordinary consumer, and/or the foreseeable risk of harm to public health and welfare posed by PFAS outweighed the cost to Defendants of reducing or eliminating such risk.

105.     Defendants knew or should have known about feasible alternatives to their PFAS Products without the use of PFAS, and the omission of such alternative designs rendered Defendants' products not reasonably safe.

106.     As a direct and proximate result of the defects previously described, several of Plaintiff's wells have been, and continue to be, contaminated with PFAS in varying amounts over time, causing Plaintiff's significant injury and damage.

107.     As a direct and proximate result of the Defendants' acts and omissions as alleged herein, Plaintiff have incurred, is incurring, and will continue to incur damages related to PFAS contamination of its wells in an amount to be proved at trial.

108.     Defendants knew it was substantially certain that their acts and omissions described above would cause injury and damage, including PFAS contamination of drinking water wells. Defendants committed each of the above-described acts and omissions knowingly, willfully, and with oppression, fraud, and/or malice. Such conduct was performed to promote sales of PFAS Products, in conscious disregard of the probable dangerous consequences of that conduct and its reasonably foreseeable impacts on public health and welfare. Therefore, Plaintiff requests an award of punitive damages in an amount sufficient to punish these Defendants and that fairly reflects the aggravating circumstances alleged herein.

109.     Defendants are strictly, jointly, and severally liable for all such damages, and Plaintiff is entitled to recover all such damages and other relief as set forth below.

**SECOND CAUSE OF ACTION**
**Strict Products Liability for Failure to Warn**
**(Against All Defendants)**

110.     Plaintiff realleges each of the preceding paragraphs and incorporates each such paragraph as if fully stated herein.

111.     As designers, manufacturers, distributors, sellers, suppliers, and/or marketers of PFAS Products, Defendants had a strict duty to warn against latent dangers resulting from foreseeable uses of their products that Defendants knew or should have known about.

112.     Defendants knew that third parties would purchase PFAS Products and use them without inspection for defects.

113.    PFAS Products purchased or otherwise acquired (directly or indirectly) from Defendants by third parties were applied, discharged, disposed of, or otherwise released at various locations, at various times, and in various amounts onto the lands and/or water in the vicinity of Plaintiff's drinking water production wells.

114.    The PFAS Products purchased by third parties were used in a reasonably foreseeable manner and without substantial change in the condition of such products. 101. Defendants knew or should have known that the use of PFAS Products in their intended manner would result in the discharge, disposal, or release of PFAS onto land or into water.

115.    The PFAS Products used in the vicinity of Plaintiff's drinking water production wells were defective in design and unreasonably dangerous products for the reasons set forth above.

116.    Despite the known and/or reasonably foreseeable hazards to human health and welfare associated with the use of PFAS Products in the vicinity of Plaintiff's drinking water production wells, including contamination of public drinking water wells with PFAS, Defendants failed to provide adequate warnings of, or take any other precautionary measures to mitigate, those hazards.

117.    In particular, Defendants failed to describe such hazards or provide adequate precautionary statements regarding such hazards in the labeling of their PFAS Products or otherwise.

118.    As a direct and proximate result of Defendants' failure to warn of the hazards posed by disposal or release of PFAS Products in the vicinity of public drinking water wells that were, or reasonably should have been, known to them, PFAS contaminate Plaintiff's wells in varying amounts.

119.    As a direct and proximate result of Defendants' acts and omissions as alleged herein, Plaintiff has incurred, is incurring, and will continue to incur damages related to PFAS contamination of its wells in an amount to be proved at trial.

120.    Defendants knew it was substantially certain that their acts and omissions described above would cause injury and damage, including PFAS contamination of drinking water wells.

---

Defendants committed each of the above-described acts and omissions knowingly, willfully, and with oppression, fraud, and/or malice. Such conduct was performed to promote sales of PFAS Products, in conscious disregard to the probable dangerous consequences of that conduct and its reasonably foreseeable impacts on public health and welfare. Therefore, Plaintiff requests an award of punitive damages in an amount sufficient to punish these Defendants and that fairly reflects the aggravating circumstances alleged herein.

121.    Defendants are strictly, jointly, and severally liable for all such damages, and Plaintiff is entitled to recover all such damages and other relief as set forth below.

### THIRD CAUSE OF ACTION
### Negligence
### (Against All Defendants)

122.    Plaintiff realleges each of the preceding paragraphs and incorporates each such paragraph as if fully stated herein.

123.    As commercial manufacturers, sellers, distributors, suppliers, marketers, and/or designers of PFAS Products, Defendants owed a duty of care to Plaintiff and to third-party end users not to place into the stream of commerce products that were in a defective condition and unreasonably dangerous to drinking water in Plaintiff's service area.

124.    Defendants breached this duty by negligently designing, formulating, manufacturing, distributing, selling, supplying, and/or marketing such unreasonably dangerous PFAS Products into the stream of commerce, including in the Plaintiff's service area, even when they knew or should have known about the dangers PFAS posed to drinking water wells.

125.    As a direct and proximate result of Defendants' acts and omissions as alleged herein, Plaintiff has incurred, is incurring, and will continue to incur damages related to PFAS contamination of its wells in an amount to be proved at trial.

126.    Defendants knew it was substantially certain that their acts and omissions described above would cause injury and damage, including PFAS contamination of drinking water wells. Defendants committed each of the above-described acts and omissions knowingly, willfully, and with oppression, fraud, and/or malice. Such conduct was performed to promote sales of PFAS Products, in conscious disregard to the probable dangerous consequences of that conduct and its

reasonably foreseeable impacts on public health and welfare. Therefore, Plaintiff requests an award of punitive damages in an amount sufficient to punish these Defendants and that fairly reflects the aggravating circumstances alleged herein.

127.    Defendants are jointly and severally liable for all such damages, and Plaintiff is entitled to recover all such damages and other relief as set forth below.

## FOURTH CAUSE OF ACTION
### Public Nuisance
### (Against All Defendants)

128.    Plaintiff realleges each of the preceding paragraphs and incorporates each such paragraph as if fully stated herein.

129.    Plaintiff provides drinking water from its wells to residents and businesses for drinking, bathing, cleaning, washing, and other uses.

130.    Because Plaintiff is a public entity, the water it provides to those residents and businesses is a public or commonly held resource. Members of the public have a right to have their water remain clean and potable, free of contamination by toxic man-made compounds.

131.    Defendants' acts and omissions, including their manufacture, promotion, marketing, sale, distribution, supply, defective design of, and/or failure to warn regarding PFAS in their products, contaminated Plaintiff's wells.

132.    Consequently, Defendants substantially interfered with and caused damage to a public or common resource that endangered public property, as well as the health, safety, and comfort of a considerable number of persons. Such action creates, contributes to, or maintains a public nuisance.

133.    As a direct and proximate result of Defendants' acts and omissions as alleged herein, Plaintiff has incurred, is incurring, and will continue to incur damages related to PFAS contamination of its wells in an amount to be proved at trial.

134.    As an owner of water production wells and purveyor of drinking water, Plaintiff suffers injuries different in kind from the community at large because it relies entirely upon its groundwater production wells for its public service functions.

135.    Defendants knew it was substantially certain that their acts and omissions described above would cause injury and damage, including PFAS contamination of drinking water wells. The Defendants committed each of the above-described acts and omissions knowingly, willfully, and with oppression, fraud, and/or malice. Such conduct was performed to promote sales of PFAS Products, in conscious disregard to the probable dangerous consequences of that conduct and its reasonably foreseeable impacts on public health and welfare. Therefore, Plaintiff requests an award of punitive damages in an amount sufficient to punish these Defendants and that fairly reflects the aggravating circumstances alleged herein.

136.    Defendants are jointly and severally liable for all such damages, and Plaintiff is entitled to recover all such damages and other relief as set forth below.

### FIFTH CAUSE OF ACTION
### Trespass
### (Against All Defendants)

137.    Plaintiff realleges each of the preceding paragraphs and incorporates each such paragraph as if fully stated herein.

138.    Plaintiff owns and possesses its drinking water production system, including drinking water production wells that extract groundwater in Plaintiff's service area.

139.    Plaintiff actually and actively exercises its rights to appropriate and use groundwater drawn from its wells.

140.    Plaintiff did not give any Defendant permission to cause PFAS to enter its groundwater wells.

141.    Defendants knew or reasonably should have known that PFAS have a propensity to infiltrate groundwater aquifers when released to the environment; are mobile and persistent groundwater contaminants capable of moving substantial distances within aquifers; are toxic to human health; and are therefore hazardous to drinking water systems and human health.

142.    Defendants manufactured, promoted, marketed, distributed, and/or sold PFAS Products, which Defendants knew or reasonably should have known would virtually certainly be discharged and release toxic PFAS into the ground, septic, and sewer system, and intrude upon, contaminate, and damage Plaintiff's possessory interest.

143.    Defendants' conduct constitutes a continuing unauthorized intrusion and a continuing trespass onto Plaintiff's property.

144.    Each Defendant is a substantial factor in bringing about the contamination of Plaintiff's wells, and each Defendant aided and abetted the trespasses and is jointly responsible for the injuries and damage caused to Plaintiff.

145.    As a direct and proximate result of Defendants' acts and omissions as alleged herein, Plaintiff has incurred, is incurring, and will continue to incur damages related to PFAS contamination of its wells in an amount to be proved at trial.

146.    Defendants knew it was substantially certain that their acts and omissions described above would cause injury and damage, including PFAS contamination of drinking water wells. Defendants committed each of the above-described acts and omissions knowingly, willfully, and with oppression, fraud, and/or malice. Such conduct was performed to promote sales of PFAS Products, in conscious disregard to the probable dangerous consequences of that conduct and its reasonably foreseeable impacts on public health and welfare. Therefore, Plaintiff requests an award of punitive damages in an amount sufficient to punish these Defendants and that fairly reflects the aggravating circumstances alleged herein.

147.    Defendants are jointly and severally liable for all such damages, and Plaintiff is entitled to recover all such damages and other relief as set forth below.

## VI.    PRAYER FOR RELIEF

148.    Plaintiff Sacramento Suburban Water District prays for judgment against Defendants, jointly and severally, awarding Plaintiff:

    a.    Compensatory damages in an amount according to proof;

    b.    Punitive damages in an amount to be determined at trial;

    c.    Injunctive and equitable relief, including in the form of a fund to abate the nuisance and trespass;

    d.    All appropriate declaratory relief, including;

    e.    Plaintiff's costs in prosecuting this action, including reasonable attorneys' fees, court costs, expert fees, and other expenses of litigation;

f.   Pre-judgment interest and post-judgment interest; and

g.   All other relief this Court deems just, proper, and equitable.

Dated:  June 10, 2022                    Respectfully submitted,

                                         **SHER EDLING LLP**

                                         By: _/s/ Timothy R. Sloane_
                                         VICTOR M. SHER (SBN 96197)
                                         MATTHEW K. EDLING (SBN 250940)
                                         STEPHANIE D. BIEHL (SBN 306777)
                                         TIMOTHY R. SLOANE (SBN 292864)
                                         100 Montgomery St. Ste. 1410
                                         San Francisco, CA 94104
                                         Tel.: (628) 231-2500
                                         vic@sheredling.com
                                         matt@sheredling.com
                                         stephanie@sheredling.com
                                         tim@sheredling.com

---

**COMPLAINT**                                                    27

## VII.    DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff requests a trial by jury of all claims asserted in this Complaint.

Dated: June 10, 2022                          Respectfully submitted,

**SHER EDLING LLP**

By: */s/ Timothy R. Sloane*

VICTOR M. SHER (SBN 96197)
MATTHEW K. EDLING (SBN 250940)
STEPHANIE D. BIEHL (SBN 306777)
TIMOTHY R. SLOANE (SBN 292864)
100 Montgomery St. Ste. 1410
San Francisco, CA 94104
Tel.: (628) 231-2500
vic@sheredling.com
matt@sheredling.com
stephanie@sheredling.com
tim@sheredling.com